**DEFENDERS OF WILDLIFE,**
**et al., Plaintiffs,**

v.

**Bruce BABBITT, et al., Defendants.**

**Civ.A. No. 96–160 GK.**

United States District Court,
District of Columbia.

March 27, 1997.

Eric R. Glitzenstein, Katherine A. Meyer, Kimberley K. Walley, Meyer & Glitzenstein, Washington, DC, for plaintiffs.

Charles W. Brooks, U.S. Department of Justice, Wildlife and Marine Resources Section, Environment and Natural Resources Division, Washington, DC, for defendants.

## MEMORANDUM OPINION

KESSLER, District Judge.

Plaintiffs are conservation organizations challenging a final decision by the United States Fish and Wildlife Service ("FWS") refusing to issue a proposed rule listing the contiguous United States population of the Canada Lynx as an endangered or a threatened species under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.* Plaintiffs allege that the decision by the FWS that listing the Lynx as endangered or threatened was "not warranted" was "arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law," in violation of § 706(2)(A) of the Administrative Procedure Act ("APA"), 5, U.S.C. § 706(2)(A).

The matter is now before the Court on cross-motions for summary judgment. Having considered the parties' motions, oppositions and replies thereto, as well as the administrative record in this case, and having heard the parties' oral arguments on February 7, 1997, the Court denies Defendants' motion and grants Plaintiffs' motion as set forth below.

## I. Factual Background [1]

### A. The Canada Lynx

The Canada Lynx, *Felix lynx canadensis* ("Lynx"), is a medium-sized cat comparable in size to a bobcat. It is distinguished from other cats of similar size, such as the bobcat, by its long legs and large paws which make it particularly well-adapted for hunting in deep snow. *See* FWS, *Draft Proposed Rule and Notice of Petition Finding,* Administrative Record ("AR") 35, at 3. The animal's large, furry paws exhibit a special adaptation, known as a "snowshoe effect" in that its paws spread out, increasing in surface area by 30%, so that the animal can travel quickly over deep snow. The Lynx' elongated back legs are specially adapted for springing action, which is necessary for a predator that relies on stealth and ambush to catch its prey in a habitat characterized by deep snow. Washington Dep't of Wildlife ("WDW"), *Status of the North American Lynx in Washington* (1993), AR 245 at 1.

In addition, unlike the bobcat or other predators which consume a variety of different kinds of animals, the Lynx is a "specialized carnivore" that depends heavily on one particular prey—the snowshoe hare. *See Mem. from FWS Reg. Dir., Reg. 6 to Dir., FWS Re: Ninety–Day Admin. Finding on Pet. to List the Conterminous United States Population of the Canada Lynx,* AR 62 at 2; Washington Dep't of Wildlife ("WDW"), *Native Cats of Washington,* AR 322 at 20. Snowshoe hare populations fluctuate according to a natural ten-year cycle. Because of the inextricable link between the snowshoe hare population and the Lynx population it follows that the Lynx population fluctuates according to the same ten-year cycle. AR 62 at 2. When the snowshoe hare population is large, Lynx reproduction and density are high. When hare populations "crash", Lynx populations correspondingly decrease. AR 245 at 19–22. Because the Lynx depends on the snowshoe hare to survive, "good snowshoe hare ... habitat is good lynx habitat."

---

1. For purposes of these motions, the Court relies on those facts contained in the extensive Administrative Record and on Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue ("Pl.'s Facts"), to which Defendants failed to submit in opposition any "statement of genuine issues setting forth all material facts as to which ... there exists a genuine issue necessary to be litigated." *See* Local Rule 108(h).

AR 62 at 2. The Lynx is therefore generally found in "open, mature conifer forests" containing downed logs because this is the habitat where snowshoe hare are generally found. *Id.*

The North American range of the Lynx currently extends from Alaska, through Canada, and into the northern part of the contiguous United States. Historically, the Lynx inhabited a substantially larger range which included New England, the Great Lakes, the Rocky Mountains and the Pacific Northwest. AR 248 at 9. The Lynx population in the lower 48 states has declined dramatically for many reasons, including habitat degradation, trapping, logging, road building and other development. AR 182, 245, 247, 248, and 372. The species is now scattered in small subpopulations in a very few states including Montana and Washington. AR 247 at 3. The Lynx has been completely "eliminated from approximately seventeen states" in which it once existed. AR Doc 248 at 9. Among the seventeen states are New Hampshire, Massachusetts, Ohio, South Dakota, Nebraska, and Oregon. *Id.* The American Lynx population has dropped so dramatically that the total number of Lynx in the contiguous United States may now be only several hundred individual animals, a population much smaller than those of many other species now listed as endangered under the ESA. *Id.* at 25.

Although some state laws and regulations currently protect the Lynx and its habitat, to date there has been no nationwide effort to protect the Lynx population from decreasing even further, due to, *inter alia,* environmental degradation and legal trapping. Over the past two decades, the FWS has repeatedly recognized that the Lynx might warrant protection under the ESA even though the agency has taken no action to provide such protection. As early as 1977, the FWS' Office of Endangered Species reviewed the status of the Lynx and concluded that the "lynx has been totally extirpated in 15 of the 30 states, south of the Canadian border, in which it originally is thought to have occurred," and that in "14 of the remaining States, the species is considered by at least some authorities to be 'rare,' 'endangered,' or in some other category of concern." FWS, Office of Endangered Species, *The Lynx in the Lower 48 States* (1977), AR 405 at 7. In 1982, the FWS formally designated the Lynx as a potential "candidate" for listing as endangered or threatened, designating the Lynx in a category of species for which listing was deemed "possibly appropriate" pending "[f]urther biological research and field study." 47 Fed.Reg. 58454 (Dec. 30, 1982).

## B. Procedural history of this case

From 1982 to 1991, the FWS took no formal steps to make a decision on listing the Lynx as an endangered species. In August 1991, a coalition of conservation organizations including some of the Plaintiffs in the instant case filed a petition with the FWS requesting that the agency list the Lynx remaining in the North Cascades ecosystem of the State of Washington as endangered ("North Cascades Petition"). *See* 57 Fed.Reg. 46007, 46008 (Oct. 6, 1992), AR 284. The Acting Director of the FWS denied that petition on the grounds that (1) there was no indication that the Lynx was in danger of extinction in British Columbia and Alaska, the areas which "constitute the majority of the lynx's range" and (2) the Lynx in the North Cascades is not a "species" as defined in the ESA because it is not a "distinct population segment" within the meaning of the ESA. *Id.* at 46008–09.

After the FWS denied the North Cascades Petition, several of the petitioners filed a lawsuit challenging that decision in the United States District Court of the Western District of Washington, *see Canada Lynx et al. v. Babbitt,* Case No. C92–1269 (W.D.Wash. 1992). While that case was pending, on March 11, 1993, the Director of Region 6 of the FWS wrote a memorandum to the Acting Director of the FWS urging that the agency's finding on the North Cascades Petition be rescinded or amended. Region 6 of the FWS ("Region 6") comprises a significant portion of the Lynx's historical range, including Colorado, Montana, North Dakota, Utah, and Wyoming. The March 1993 memorandum took the position that the agency's rationale for denying the North Cascades petition was inconsistent with past listing decisions and therefore might lead to the delisting of

species, such as the grizzly bear, which were already protected under the ESA. One "major problem with the finding", the Regional Director stated, "was that it primarily addressed the *present* range of the lynx and did not properly consider *historical* range." "Discussion Document", attached to *Memorandum from Deputy Regional Director, Region 6 to FWS Director Re: North Cascades Lynx Finding and Implications to Draft Vertebrae Population Policy* (March 11, 1993), AR 265 at 1 (emphasis in original). The memorandum stated that if the same reasoning used to deny the North Cascades petition were applied to species already listed, many species would not receive the protection which they merited under the ESA. *Id.*

On April 28, 1993, the parties in *Canada Lynx v. Babbitt* reached a settlement agreement under which the FWS agreed to reevaluate its 90–day finding on the North Cascades Petition. The Director of Region 1 of the FWS, which encompasses Lynx habitat in the North Cascades in Washington State, prepared a memorandum recommending a new finding emphasizing that the FWS "must evaluate the decline of the species in its *historical* range and whether the United States population *historically* represented a *significant portion* of the species [sic] entire range." *Memorandum from Regional Director, Region 1. Re: Evaluation of the Petition to Emergency List the North American Lynx in the North Cascades Ecosystem* (June 18, 1993), AR 256 at A–4 (emphasis added). The Region 1 memorandum recommended denying the North Cascades Petition, but urged the FWS to clarify that the Lynx population's "emigration and immigration across the United States/Canada border" did not preclude its being considered a "distinct population", and therefore would not require the delisting of distinct populations of the bald eagle, grizzly bear, gray wolf, or woodland caribou which had already been listed. *Id.*

On July 9, 1993, the FWS published a new 90–day finding. Although this new finding once again denied the North Cascades Petition, it did so on different grounds than those stated in the first denial. This time the FWS

acknowledged that "distinct population segments" within the meaning of the ESA could include either "populations that are reproductively isolated from other members of the species" or "the entire conterminous United States population of a species". AR 256 at 36924. The FWS therefore denied the petition as to the North Cascades Lynx population, but concluded that further inquiry was needed with respect to the entire Lynx population. FWS found that the evidence before it justified conducting an "in-depth range-wide status review for the lynx". *Id.* Subsequently, in February 1994, the Service published a notice soliciting information from the scientific community and the public concerning the "biological status" of the Lynx. 59 Fed.Reg. 4887 (Feb. 2, 1994), AR 227. Taking into account the Service's commitment to conduct such a status review, the plaintiffs in the Washington case stipulated to dismissal of their lawsuit. *See Canada Lynx v. Babbitt*, AR Doc. 249.

In April 1994, several of the other Plaintiffs in this case, including the Biodiversity Legal Foundation ("BLF"), submitted a petition asking FWS to list the Lynx as threatened or endangered throughout its range in the "lower conterminous United States" *Petition to List the North American Lynx* (April 23, 1994), AR 171 at 1 ("BLF Petition"). In August 1994, Region 6 of the FWS prepared a "90–day finding", which concluded that "there is substantial information to indicate that listing of the contiguous United States population of the Canada lynx may be warranted." *Memorandum from Regional Director, Region 6 to FWS Director* (Aug. 18, 1994), AR 62 at 5. In reaching this conclusion, the Region 6 Regional Director emphasized that habitat destruction and fragmentation, due particularly to heavy logging, threatened the continued existence of the Lynx. *Id.* at 3–4.

The FWS published the positive 90–day finding, prepared by Region 6, stating that all five of the criteria for listing a species as endangered under the ESA were applicable to the Lynx. See 59 Fed.Reg. 44123–24 (Aug. 26, 1994), AR 54. In the same *Federal Register* publication, FWS indicated that it was in the process of conducting a formal status

review of the Lynx, as required under the ESA. As part of that status review, the agency solicited comments and relevant data from the public as well as from independent Lynx experts as to whether the Lynx should be listed.

Region 6, which contains a significant portion of the Lynx's historic range, assumed the principal duties of conducting a status review and drafting a proposed listing decision. The FWS' biologists in Region 6 reviewed the comments and information received and conducted their own thorough review of the available scientific and commercial information. In October 1994, they concluded that the Lynx should be listed throughout its range in the conterminous United States. *Proposed Rule to List One Population Segment of the Canada Lynx as Endangered and One Population Segment As Threatened Within the Contiguous United States* (Oct. 17, 1994), AR 35 at 1–2, 41. The biologists drafted a proposal to list one segment of the Lynx population, in the Northwest and Northern Rockies, as threatened, and a second population, in the Southern Rockies, Great Lakes, and Northeast, as endangered. This recommendation was accompanied by an extensive, 50–page analysis of the Lynx's history and current status. *See* AR 35. The Region 6 biologists concluded that "Canada lynx populations in the contiguous United States have suffered significant declines due to trapping and hunting and habitat loss", *id.* at 1, and that at least four of the five statutory criteria for listing a species under the ESA apply to the Lynx. *Id.* at 19–43. Relying on extensive citations of scientific evidence, the biologists concluded that Lynx habitat is currently being destroyed, degraded, and fragmented by a number of factors including timber harvest, fire suppression, road construction, and clearing of forests for urbanization, ski areas, and agriculture. *Id.* at 25–27.

Region 6 biologists then circulated their draft proposal for review by FWS biologists in the three other regions containing Lynx populations. *See Memorandum from Deputy Regional Director, Region 6 to Regional Directors, Regions 1, 3, and 5 Re: Draft Proposed Rule for the Canada Lynx* (Oct. 11, 1994), AR 37. Biologists from Region 3 and Region 5, which encompass the Great Lakes area and the Northeast, respectively, both supported the proposed rule. Only the Director of Region 1, which encompasses the Pacific Northwest, opposed it. *See* AR 27 (Region 5); AR 23 (Region 3); AR 18 (Region 1). Even within Region 1, the FWS biologists in the agency's field office in Washington State—the state with the largest Lynx population in Region 1—supported the proposed rule. *See* AR 24.

Much of the voluminous Administrative Record on the present rule consists of comments and reactions to the rule proposed by the Region 6 biologists. Although not every comment indicated complete agreement with the 50–page report, it is significant that not a single biologist or Lynx expert employed by the FWS disagreed with the recommendation of the Region 6 biologists that the Lynx be listed.

On October 20, 1994, Region 6 submitted its listing proposal to the Acting Director of the FWS in Washington, D.C. for approval. AR 34. Two weeks later, the Acting Director of the Service, Richard Smith, rejected Region 6's proposal in a five-page memorandum which summarily concluded that the "listing of the Lynx in the 48 contiguous States is not warranted." *Memorandum from Acting Director, FWS to Regional Director, Region 6* (Nov. 10, 1994) ("12–month Finding Memo"), AR 25, at 5. In this brief document, the Acting Director cited no scientific study or Lynx expert, but instead set forth a number of conclusions which directly contradicted the conclusions reached by the Region 6 biologists. The finding stated, without further explanation, that "[t]here is little evidence that lynx populations have suffered significant declines due to trapping and hunting," *id.* at 4, and that "[h]unting and trapping pressure on the lynx in the U.S. has always been low." *Id.* at 5.

The Service published this 12–month finding, with some minor modifications, in the *Federal Register,* as the agency's, final decision rejecting protection for the Lynx under the ESA. *See* 59 Fed.Reg. 66507 (Dec. 27, 1994) ("12–month Finding Notice"), AR 7. Without mentioning the detailed study and

proposal by Region 6 biologists, the agency announced that, having conducted a status review, and upon "careful[ ] evaluat[ion][of] the best available scientific and commercial information", it concluded that listing the species was not warranted. *Id.* at 66509. Without citing any scientific or commercial information, the agency set forth conclusions directly opposite to each conclusion reached by the Region 6 biologists on each statutory factor. Without supporting citations, the FWS concluded that the species was not overutilized, that the Lynx "currently occupies much of its original historic range", that existing regulatory mechanisms were adequate to protect the species, and that the "Service is unable to substantiate that trapping, hunting, poaching, and present habitat destruction threaten the continued existence of the Lynx in the wild in the contiguous United States." *Id.* With respect to Plaintiffs' request that the southern Rocky Mountain population of the species should receive expedited protection under the ESA, the Service stated that there was no "substantial information that the southern Rocky Mountain population of the Canada lynx meets the definition of a 'species' under section 3(15) of the Act." *Id.*

On March 27, 1995, Plaintiffs gave the Secretary of the Interior and the Director of the FWS detailed notice that the agency's refusal to list the Lynx as an endangered or threatened species violated Congress' intent in enacting the ESA. Plaintiffs subsequently filed this lawsuit on January 30, 1996.

## II. Statutory Framework

■ The ESA is the "'most comprehensive legislation for the preservation of endangered species ever enacted by any nation.'" *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. ——, ——, 115 S.Ct. 2407, 2413, 132 L.Ed.2d 597 (1995) *quoting Tennessee Valley Authority v. Hill,* 437 U.S. 153, 180, 98 S.Ct. 2279, 2294, 57 L.Ed.2d 117 (1978). When Congress enacted the statute in 1973, it intended to bring about the "better safeguarding, for the benefit of all citizens, [of] the Nation's heritage in fish, wildlife, and plants." 16 U.S.C. § 1531(a)(5). Having found that a number of species of fish, wildlife, and plants in the United States had become extinct "as a consequence of economic growth and development untempered by adequate concern and conservation", 16 U.S.C. § 1532(a)(1), Congress intended the ESA to "provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species ..." *Id.* at § 1531(b). In particular, the legislative history of the statute reflects a "consistent policy decision by Congress that the United States should not wait until an entire species faces global extinction before affording a domestic population segment of a species protected status." *Southwest Ctr. for Biological Diversity v. Babbitt,* 926 F.Supp. 920, 924 (D.Ariz.1996); *see* H.R.Rep. No. 412, 93d Cong., 1st Sess. 10 (1973), *reprinted in* 1978 U.S.C.C.A.N. 2989, 2998.

The Act imposes certain responsibilities on the Secretary of the Interior, 16 U.S.C. § 1531(b), and the Secretary of the Interior has in turn delegated day-to-day authority for implementation of the ESA to the FWS, an agency within the Department of the Interior. 50 C.F.R. § 402.01(b). The ESA's protection of a species and its habitat is triggered only when the FWS "lists" a species in danger of becoming extinct as either "endangered" or "threatened". 16 U.S.C. § 1533. The Act defines a "species" as "any subspecies of fish or wildlife ... and any distinct population of any species of vertebrate fish or wildlife which interbreeds when mature". *Id.* at § 1532(16). A species is "endangered" when it is in "danger of extinction throughout all or a significant part of its range", while a species is "threatened" when it is "likely to become an endangered species within the foreseeable future". *Id.* at §§ 1532(6), (20), 1533(c).

As soon as the FWS lists a species as either endangered or threatened, that species is immediately entitled to a number of measures designed to preserve and protect it. For example, it is illegal for anyone to "take" an endangered or threatened animal by, *inter alia* hunting, trapping, killing, or capturing such an animal or attempting to do so. 16 U.S.C. § 1533(c), 1538(a)(1), 50

C.F.R. §§ 17.21, 17.31. After a species is listed, federal agencies are required to ensure that no future actions they take will jeopardize the continued existence of the species. 16 U.S.C. § 1536(a)(2). The FWS itself must also take a number of specific steps to protect the species and its habitat, including creating and implementing a "recovery plan" for each listed species. *Id.* at § 1533(f).

The FWS has a duty to independently identify species that must be listed as well as to respond to listing petitions from the public. 16 U.S.C. § 1533(b)(A). In the latter instance, the FWS has 90 days from filing within which to determine whether the "petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted", *id.* at § 1533(b)(3)(A); 50 C.F.R. § 424.14(b). If the FWS determines that the petition presents such information, the agency must conduct "a review of the status of the species concerned", *id.*, to determine whether listing the species "is warranted". *Id.* at § 1533(b)(3)(B). This status review must be concluded within twelve months of the agency's receipt of the petition. If the agency concludes that such a listing "is warranted", it must publish a proposed rule in the *Federal Register* listing the species and providing an opportunity for public comment. *Id.* at § 1533(b)(5). Within twelve months of publishing the proposed rule, and after considering public comment and all relevant evidence, the agency must make a final decision whether to adopt a final rule listing the species. *Id.*

Plaintiffs in the instant case are challenging the FWS' twelve-month decision that listing the Canada Lynx is "not warranted". Thus the issue before the Court is the agency's refusal to take the interim step of issuing the proposed rule sought by Plaintiffs and drafted by the FWS' own Region 6 biologists.

Plaintiffs cannot, and do not, ask that the Court take the final step under the statute of ordering listing of the Lynx. Instead, Plaintiffs ask the Court, in the alternative, to: (1) order the FWS to issue a proposed rule listing the Lynx, or (2) remand to the agency for a *de novo* decision on whether to issue a proposed rule, with such decision to be based on the existing Administrative Record and to be consistent with the requirements of the ESA and relevant regulations.

Were the Court were to grant the relief sought as alternative (1), the agency would still have a full year to consider public comment and other relevant information in determining whether to issue a final rule listing the Canada Lynx. Were the Court to grant the relief sought as alternative (2), the agency would be required to take another, thorough, look at the voluminous Administrative Record in this matter in light of applicable statutes, statutory regulations, and case law.

## III. The Refusal of FWS to List the Canada Lynx as Threatened or Endangered Is Arbitrary and Capricious, and Contrary to the ESA Statutory Standard.

### A. Standard of Review

This case is brought under the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). Under the APA's deferential standard of judicial review, an agency's action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law". 5 U.S.C. § 706(2)(A). The court may not substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). The court's review of an agency's decision is limited to the administrative record. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). The court's limited role is to ensure that the agency's decision is based on relevant factors and not a "clear error of judgment". *Id.* If the "agency's reasons and policy choices … conform to 'certain minimal standards of rationality' … the rule is reasonable and must be upheld." *Small Refiner Lead Phase–Down Task Force v. EPA*, 705 F.2d 506, 521 (D.C.Cir.1983) (citation omitted). This standard presumes the validity of agency action.

*Ethyl Corp. v. EPA,* 541 F.2d 1, 34 (D.C.Cir. 1976) (en banc), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 2663, 49 L.Ed.2d 394 (1976). Deference to an agency's scientific and technical expertise dictates that agency action must be upheld as long as the agency has "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co.,* 462 U.S. at 105, 103 S.Ct. at 2256.

■ In exercising its narrowly defined duty under the APA, a court must consider whether the agency acted within the scope of its legal authority, whether the agency adequately explained its decision, whether the agency based its decision on facts in the record, and whether the agency considered the relevant factors. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861–62, 104 L.Ed.2d 377 (1989); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971); *Professional Drivers Council v. Bureau of Motor Carrier Safety,* 706 F.2d 1216, 1220 (D.C.Cir.1983). The court must defer to the agency's expertise, particularly with respect to decision-making which involves "a high level of technical expertise". *Marsh,* 490 U.S. at 377, 109 S.Ct. at 1861; *see State of New York v. Reilly,* 969 F.2d 1147, 1150· (D.C.Cir.1992) ("We are particularly deferential when reviewing agency actions involving policy decisions based on uncertain technical information.").

■ The deference a court must accord an agency's scientific or technical expertise is not unlimited, however. Thus the presumption of agency expertise may be rebutted if its decisions, even though based on scientific expertise, are not reasoned. *ALLTEL Corp. v. FCC,* 838 F.2d 551, 562 (D.C.Cir.1988). Where an agency fails to articulate "a rational connection between the facts found and the choice made", *see Baltimore Gas & Elec. Co.,* the Court "'may not supply a reasoned

basis for the agency's action that the agency itself has not given.'" *Dithiocarbamate Task Force v. EPA,* 98 F.3d 1394, 1401 (D.C.Cir.1996) (*quoting Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983)). If an agency fails to articulate a rational basis for its decision, it is appropriate for a court to remand for reasoned decision-making. *See, e.g., Carlton v. Babbitt,* 900 F.Supp. 526, 533 (D.D.C.1995) (remanding FWS' 12–month finding that the grizzly bear should not be reclassified because the FWS "failed to sufficiently explain how it exercised its discretion with respect to certain of the statutory listing factors").

## B. The FWS applied the wrong legal standard in its listing decision.

■ The ESA mandates that the decision on listing a species be made "solely on the basis of the best scientific and commercial data available at the time the decision is made". 16 U.S.C. § 1533(b). This standard contrasts starkly with the standard relied on by the Acting Director of the FWS, who concluded that the rule proposed by Region 6 "did not provide any *conclusive evidence* of the biological vulnerability or real threats to the species in the contiguous 48 states." AR 25 at 5 (emphasis added).[2] The statute contains no requirement that the evidence be conclusive in order for a species to be listed. Application of such a stringent standard violates the plain terms of the statute, and therefore justifies reversal of the agency's decision. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

■ The statutory standard, requiring that agency decisions be made on the "best scientific and commercial data available", rather than absolute scientific certainty, is in

---

**2.** Assuming *arguendo* that this was the standard, it is not at all clear that the Region 6 biologists' report was not conclusive. Given the thorough and extensively documented 50–page analysis of the Region 6 biologists, concluding that the Lynx has been reduced from a range encompassing one-third of the contiguous United ·States to a

few remnant, scattered populations, *see* AR 36, and the overwhelming consensus among the biologists, after evaluating the existing scientific evidence, that the Lynx must be listed, it is difficult to imagine how much more evidence would be needed to qualify as "conclusive".

keeping with congressional intent in crafting the ESA. Congress repeatedly explained that it intended to require the FWS to take preventive measures *before* a species is "conclusively" headed for extinction. The purpose of creating a separate designation for species which are "threatened", in addition to species which are "endangered", was to try to "regulate these animals before the danger becomes imminent while long-range action is begun." S.Rep. No. 307, 93d Cong. 1st Sess. 3 (1973), *reprinted in Legislative History of the Endangered Species Act of 1973, As Amended in 1976, 1977, 1978.1979, and 1980 ("Leg.Hist."),* at 302.

■ The legislative history of the ESA contains ample expressions of Congressional intent that preventive action to protect species be taken sooner rather than later. *See, e.g., Leg. Hist.* at 204 (H.R.Rep. No. 412, 93d Cong., 1st Sess. 5 (1973) ("[i]n the past, little action was taken until the situation became critical and the species was dangerously close to total extinction. This legislation provides us with the means of preventive action.") (remarks of Rep. Clausen); *id.* at 205 ("[i]n approving this legislation, we will be giving authority for the inclusion of those species which ... might be threatened by extinction in the near future. Such foresight will help avoid the regrettable plight of repairing damages already incurred. By heeding the warnings of possible extinction today, we will prevent tomorrow's crisis") (remarks of Rep. Gilman); *id.* at 144 ("[s]heer self-interest impels us to be cautious," and "the institutionalization of that caution lies at the heart of the [ESA]").

■ Judicial and administrative interpretations of the ESA have consistently construed the statute's "best available data" standard as requiring far less than "conclusive evidence." The Ninth Circuit Court of Appeals, for example, explained that by requiring the listing of species based on the "best available data", Congress intended to give "the benefit of the doubt to the species". *Conner v. Burford,* 848 F.2d 1441, 1454 (9th Cir.1988). The "best available data" requires the agency to consider the scientific information presently available. *Id.; accord Roosevelt Campobello Int'l Park v. EPA,* 684 F.2d 1041, 1054–55 (1st Cir.1982). In setting aside the refusal of FWS to list the Queen Charlotte goshawk and the Alexander Archipelago wolf, Judge Stanley Sporkin of this Court cited the failure of the agency to make its decisions "*solely* on the basis of the best scientific and commercial date [available]." *Biodiversity Legal Foundation v. Babbitt,* 943 F.Supp. 23, 25–26 (D.D.C.1996) (emphasis in original); *accord Southwest Ctr. for Biological Diversity v. Babbitt,* 939 F.Supp. 49, 52 (D.D.C.1996).

The FWS itself has taken the position that it need not, and must not, wait for conclusive evidence in order to list a species. For example, in its decision to list the northern spotted owl, it explained that because the agency had "used the best data available to prepare the proposed rule", it was "not obligated to have data on all aspects of a species' biology prior to reaching a determination on listings." 55 Fed.Reg. 26114, 26128 (June 26, 1990). Moreover, the agency concluded that "[t]o withdraw the proposal and conduct additional research would not improve the status of the [species] and would not be in keeping with the mandates of the Endangered Species Act." *Id.* at 26129. More recently, the FWS decided to list the California red-legged frog, even though many aspects of the species' status were "not completely understood", because "a significant delay in listing a species due to large, long-term biological or ecological research efforts could compromise the survival of the [species]." 61 Fed.Reg. 25813, 24817 (May 23, 1996).

■ The FWS, as the agency charged with implementing the ESA, and the courts have thus consistently held that the statute requires listing decisions to be made on the basis of the "best available data" rather than the more stringent standard of "conclusive evidence." Because the agency's instant decision thus conflicts with the agency's earlier interpretation of the same statutory provision, the Court must accord that decision less judicial deference than it would give to a consistently held agency view. *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987).

■ At oral argument on the instant motions, the government attempted to argue that even though the agency's decision repeatedly used the phrase "conclusive evidence",[3] it was actually applying the "best available data" standard required by the ESA. Defendants have, however, pointed to nothing in the Administrative Record to indicate that the agency applied anything other than the "conclusive evidence" standard it plainly states in its final decision. *See* AR 25 at 5. It is well-established that this kind of *"post hoc* rationalization" by an agency's lawyer cannot sustain a decision upon review. *See e.g., Consumer Federation of America v. U.S. Dep't of Health and Human Services,* 83 F.3d 1497, 1507 (D.C.Cir.1996) (*citing Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973)).

■ Furthermore, Defendants have gone to great lengths to argue that there is a lack of "scientific certainty" as to various aspects of the Lynx's status. The ESA does not, however, require such "certainty" to justify the listing of a species. To the contrary, the clear intent and purpose of Congress in enacting the ESA was to provide preventive protection for species before there is "conclusive" evidence that they have become extinct. Because the agency applied the wrong legal standard, in clear violation of the plain wording of the statute as well as the case law and its own prior interpretation of that statute, its decision not to list the Lynx must be set aside.

### C. The FWS acted arbitrarily and capriciously in basing its decision not to list the Canada Lynx on glaringly faulty factual premises.

■ The agency's decision not to list the Lynx made several critical factual findings that are directly contradicted by the undisputed facts in the Administrative Record.

First, the agency makes the bald assertion that "[h]unting and trapping pressure on the lynx has been historically low in the U.S. and there is little evidence that these activities pose a threat to the continued existence of this species in the wild." 59 Fed.Reg. 66507, 66508, AR 7. This claim, supported by no citation to scientific evidence, study, or data of any kind, flies in the face of the overwhelming evidence gathered and analyzed by the Region 6 biologists, who concluded that "human-induced mortality is *the most important* mortality factor for Canada lynx populations", and that the "adverse impacts of past overharvest continue to threaten Canada lynx recovery in the contiguous United States". AR 35 at 29, 33 (emphasis added). Lynx experts widely agree that "overexploitation ... is the other major systematic factor impacting populations" of Lynx. AR 247 at 37. The extensive study conducted by the Washington Department of Wildlife ("WDW"), and widely relied on by Lynx experts generally (although ignored by the FWS in its decision not to list) concluded that "human activity results in the greatest mortality of lynx, principally through trapping." AR 245 at 49. Another recent study concluded that 86% of Lynx mortalities was caused by trapping. AR 247 at 42. In Montana in particular, a dramatic decline has been attributed primarily to trapping as a result of the rising value of Lynx pelts. AR 326, at 3–4.

While the Region 6 biologists, in their proposed rule, examined both the historical and ongoing threats posed by trapping, the agency's decision discussed neither threat beyond the one dismissive and conclusory sentence quoted above. The proposed rule of Region 6 points not only to the historic depletion of Lynx populations in Idaho, AR 248 at 16, New Hampshire, AR 372 at 44–46, and Minnesota, *id.* at 44, but also explains that, despite the limits currently imposed on trapping Lynx in a number of states, the existence of any trapping at all poses a serious threat at this time to the future of the species. AR 110.

Second, the FWS states categorically that, despite a reduction in its range at the turn of the century, "the lynx currently occupies

---

**3.** Acting Director Smith uses the phrase "conclusive evidence" twice, and underlines it once in his memorandum to Region 6. *See* AR 25 at 3, 5. It can hardly be argued that the use of this terminology was meaningless, in light of the failure to articulate any other legal standard applied in that memorandum.

much of its original historic range." AR 7 at 66509. Once again, the agency provides no support for this statement, in the face of overwhelming evidence in the record that the Lynx has been entirely "eliminated from approximately seventeen states" in which it once existed—including New Hampshire, Massachusetts, Ohio, South Dakota, Nebraska, and Oregon. AR 248 at 9; *see also, e.g.,* AR 247 at 3; *compare* maps attached at Pl.'s Ex. C (from AR 248 at 23 and AR 322) illustrating past and current Lynx range in the United States.

Third, the agency's final decision states that the Lynx "is actually common through its North American range" but is "considered rare because of its secretive nature". AR 7 at 66507. This statement is simply erroneous in light of overwhelming record evidence documenting the dramatic decrease over time in the Lynx population in the United States portion of its North American range. AR 34 at 7–17. Wildlife experts currently estimate that the number of Lynx in the entire contiguous United States "may not exceed several hundred individuals—far fewer than many other species now listed as endangered" under the ESA. AR 248 at 25. Again, the FWS cites no scientific evidence for its sweeping statements. To the extent that the agency decision refers to the United States population of the Lynx, it relies on inaccurate facts contradicted by the entire Administrative Record. To the extent the agency decision refers to the Canadian and Alaskan portions of the Lynx's range, it is irrelevant to the instant petition, which requests listing of the Lynx population in the contiguous United States.

Fourth, the FWS erroneously claims that a past trend of declining Lynx populations has now been reversed. Although the agency acknowledges that "at the turn of the century ... habitat loss due to human settlement and forest clearing reduced the southern range of the lynx", it asserts that "[s]ince the 1970's, this trend has reversed in some states." AR 7 at 66508. The agency cites no documentation for this sweeping claim, which runs counter to the consistent record evidence that the "trend" of destruction of Lynx habitat, and therefore of decreasing numbers

of Lynx, continues to this day. *See, e.g.,* AR 245 at viii-ix (WDW study concluded Lynx population faces intensified threat due to timber harvest practices); AR 247 at 11, 37 (Forest Service biologist John Weaver concludes that Lynx have already "declined to the point of local extinction in some portions of their native range" and other portions of the Lynx population "appear vulnerable to local and regional extinction"); AR 248 at 23 (Wildlife Society concludes that "downward trends in lynx abundance have occurred through most areas of lynx range in the contiguous U.S. and ... lynx distribution is shrinking. Much of the decline has occurred during the last 2 decades."). Far from noting an end to the "trend" of declining Lynx populations, each of the scientific studies and analyses in the Administrative Record predicts that such trends will continue absent legal protection of the species, due to ongoing damage to Lynx habitat by logging, fire suppression, roadbuilding, and other development.

Finally, the agency implies that the Lynx population in Montana has actually increased in recent years when the scientific evidence in the Administrative Record points to the exact opposite conclusion. Several of the scientific studies relied on by the Region 6 biologists conclude that Montana's Lynx population is "in serious trouble" because the animals "have shown dramatic declines with no associated increases on the expected 10 year scale ..." AR 326 at 3–4; *accord* AR 248 at 18. The agency cites no evidence for the reversal of this trend of a decreasing Lynx population in Montana. Instead, it merely asserts tangentially that the Lynx benefits from better habitat conditions in Montana than in other parts of its contiguous United States range. AR 7 at 66508.

In sum, the agency makes a number of unsupported statements which contain significant factual errors contradicted by overwhelming record evidence. These significant factual errors are clear indications that the agency's decisionmaking, based on glaringly faulty factual premises, was arbitrary and capricious and therefore must be set aside.

**D. The FWS acted arbitrarily and capriciously in rejecting the views of**

**its own experts that the Lynx satisfied four out of the five statutory criteria for listing a species as endangered or threatened.**

■ The ESA sets out five specific factors the FWS must consider in determining whether to list a species as "threatened" or "endangered". Those factors, one or more of which are sufficient to justify listing a species, are:

 (A) the present or threatened destruction, modification, or curtailment of its habitat or range;

 (B) over-utilization for commercial, recreational, scientific, or educational purposes;

 (C) disease or predation;

 (D) the inadequacy of existing regulatory mechanisms; or

 (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). Region 6 biologists, after conducting an extensive review "of all relevant literature on distribution and status of the species", concluded that at least four of these five factors—(A), (B), (D), and (E)—required the agency to list the Lynx. AR 34 at 19–43. While the exhaustive, 50–page study of the Region 6 biologists analyzes each of these factors in detail, the agency's cursory five-page decision merely states the category heading and then ignores the evidence and analysis of its experts in making conclusory statements about each factor.

**1. Present or threatened destruction, modification, or curtailment of habitat or range**

Defendants seek to argue that although forest clearing, timber harvesting, and other habitat destruction may have historically diminished the Lynx population, these threats no longer exist today. They can, however, cite nothing from the record, and certainly not from the agency's decision, that documents or explains such a reversal in the acknowledged historic trend. Instead, the agency ignores the findings of its own biologists that forest clearing and current timber management represent ongoing threats to the existence of the already greatly diminished Lynx population and that such threats will

only continue absent imposition of legal protections under the ESA. AR 35 at 23–27. In fact, the scientific studies relied on by the biologists of Region 6 conclude that Lynx in Washington State, for example, are "extremely vulnerable based on past and planned human related habitat alteration" including planned future timber harvests that greatly exceed the guidelines recommended by Lynx biologists. AR 245 at 42.

Again, Defendants try, *post hoc*, to rationalize an administrative decision that offers virtually no internal explanation. Defendants, for example, cite an article by a biologist who supports the listing of the Lynx for the proposition that "[l]ogging is not incompatible with the lynx." AR 310. However, the thrust of the article is that limited logging, conditioned on proper timber management, would not damage the Lynx population *if* the Lynx was listed and properly protected. *Id.* at 12. The agency has offered no support, nor even a claim, that logging is currently limited in a way that protects the Lynx. Without a decision to list the Lynx, there is no indication that there would be management of logging in such a way that depletion of the Lynx population would abate. Thus, the article cited by Defendants provides no support for its administrative decision not to obtain the protections of the ESA by listing the Canada Lynx.

**2. Overutilization for commercial, recreational, scientific, or educational purposes**

Under this heading, as discussed above, the agency decision fails to point to any support for its assertion that hunting and trapping currently pose little threat to the Lynx population. Although the agency refers to the fact that the Lynx was included in an international agreement limiting exports of its pelts, it offers no evidence that such protection under this international treaty has alleviated the continued threat posed to the Lynx by overutilization. *See* AR 7 at 66508.

Similarly, the FWS states that only two states, Idaho and Montana, currently allow trapping, and few animals are actually trapped there. *Id.* Nevertheless, the agency

completely ignores the findings by its own biologists that "[p]oaching ... has been a concern in nearly every State" and that "[e]levated levels of human access into forests are a significant threat to Canada Lynx because they increase the likelihood" of poaching and other encounters "which may result in more lynx deaths...." AR 35 at 25–26. Thus, even though the agency addresses "overutilization" of the Lynx by humans, it once again ignores the evidence and analysis of its own experts.

### 3. Disease or predation

This is the one factor which the Region 6 biologists conclude may not pose a significant threat to the Lynx.

### 4. Inadequacy of Existing Regulatory Mechanisms

The agency's one paragraph treatment of this factor is one of the weakest elements of its decision. Not only does FWS include no citation to record evidence of any kind, but it does not even attempt to evaluate the effectiveness of the international treaty or existing state regulations. The agency merely asserts that such protections exist, and makes no attempt to analyze past or present data to determine whether these mechanisms are effectively protecting the Lynx population from continued destruction. The agency's biologists, who did address the effectiveness of existing regulations, concluded that they were a manifest failure in adequately protecting the Lynx's habitat or the Lynx population in a way that would prevent the continued decline of the species. AR 35 at 34, 38.

### 5. Other natural or manmade factors

Although the agency discusses the Lynx's well-established dependence on the snowshoe hare, it provides no reasoning as to how this factor affects the decision to list or not list the Lynx. Experts have concluded, however, that the Lynx possesses an "array of ecological traits", including its dependence on one food source and its susceptibility to trapping, which make it particularly "vulnerable to extinction". AR 247 at 14. The agency articulates no rational reason for concluding that, because the Lynx is an "extinction-prone

species," *id.* at 8, the agency is not required by the ESA to protect it from extinction.

To the contrary, the biologists of Region 6 concluded that "other natural or manmade factors" supported listing the Lynx. They explain that competition between the Lynx and its competitors such as the bobcat and coyote may be increased when timber foresting and other human activity alter the nature of the Lynx's habitat. AR 35 at 39 Because bobcats and coyotes are "generalists able to feed on a wide variety of prey", while the Lynx is dependent on the snowshoe hare, it may be at a disadvantage when the habitat is altered and therefore become more vulnerable to the harmful effects of competition when environmental degradation occurs. *Id.* Thus the FWS' experts, its biologists, conclude that this factor too weighs in favor of listing the Lynx.

■■■ The failure of the agency, despite the views of its own experts, to articulate a rational reason for its decision under the fifth, as well as the other four, statutory factors, establishes the arbitrary and capricious nature of the agency's decision-making. *See Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C.Cir.1993) ("The requirement that agency action not be arbitrary and capricious includes a requirement that the agency adequately explain its result"); *Carlton v. Babbitt*, 900 F.Supp. 526, 533 (D.D.C. 1995) (FWS must adequately explain its listing decision under the ESA based upon statutorily prescribed factors); *Fund for Animals v. Babbitt*, 903 F.Supp. 96, 113 (FWS must articulate a rational reason for its decision).

Apparently recognizing that the FWS did not clearly articulate an analysis, based on the extensive Administrative Record, of the five factors set forth in the ESA, Defendants attempt to present alternative reasons for the decision not to list the Lynx. First, Defendants argue that the agency based its decision on the fact that the Lynx remains "plentiful in Canada and Alaska and it is not threatened with the possibility of extinction" in those areas. AR 25 at 3. Second, Defendants argue that the Lynx should not be listed under the ESA because the species

was never "resident" in the United States but merely temporarily present in the United States part of their range. Def.'s Reply at 6. Plaintiffs provide overwhelming support from the legislative history of the ESA and the FWS' own past listing decisions that neither of these arguments can provide a rational basis for the agency's decision.

 In enacting the ESA, Congress made clear that the term "endangered species" applies to any species of wildlife in danger of extinction either throughout its entire range or "any portion of its range". *Leg. Hist.* at 149 (H.R.Rep. No. 412, 93d Cong., 1st Sess.(1973). Plaintiffs are correct that the FWS cannot be allowed to dismiss the contiguous United States population of a species merely because it is more plentiful elsewhere. The agency must consider the scientific evidence relevant to the threat of extinction, or lack thereof, for that portion of the Lynx's range within the contiguous United States. AR 454 at 5 (memorandum from Region 6 biologists stating that "[a]pparently, in the lynx petition, we are not following congressional intent. If we are going to list the grizzly, wolf, and eagle, and to continue to protect species in their United States jurisdiction, we must also judge the need to list the lynx on the same basis.") Defendants rely on no authority for their claim that because the Lynx population is transient, moving throughout its range in search of food over the course of a ten-year cycle, the species is not eligible for ESA protection. As the legislative history of the ESA clearly indicates, Congress' intent was to be inclusive, rather than exclusive, in considering which species required protection. There is nothing in the record before the Court to indicate that such "transience" is either a rational or statutorily appropriate reason for the FWS to refuse to list the Lynx.

 Similarly, the agency's argument that the United States portion of the Lynx does not deserve protection because it is a mere "remnant population" of a species that once occupied an extensive range is inconsistent with its own past listing decisions. The FWS has listed the grizzly bear, eastern timber wolf, and woodland caribou under the ESA even though these species are also

"remnant populations". AR 256 at A–3. In listing these species, the FWS compared the existing contiguous United States range of each species to the far more abundant populations in Canada and Alaska and concluded that the United States portion of each species should be listed. AR 25 at 3. In listing these species, the agency recognized that the fact that an animal population consisted of a mere "remnant" of a larger historical population argued for, rather than against, protecting the species from further depletion. The agency offers no rational reason for departing from its earlier interpretation of the ESA with regard to these other "remnant populations".

## E. Conclusion

 Although the Court must defer to an agency's expertise, it must do so only to the extent that the agency utilizes, rather than ignores, the analysis of its experts. *See Northern Spotted Owl v. Hodel,* 716 F.Supp. 479, 483 (W.D.Wash.1988). Here, the FWS has consistently ignored the analysis of its expert biologists as to each of the five statutory factors, basing its decision on unsupported conclusory statements as well as facts which are directly contradicted by undisputed evidence in the Administrative Record. The FWS decision not to list the Canada Lynx and grant it the protections of the ESA is arbitrary and capricious, applied an incorrect legal standard, relied on glaringly faulty factual premises, and ignored the views of its own experts. Consequently, it must be set aside.

For the reasons set forth above, Plaintiffs' Motion for Summary Judgment must be **granted** and Defendants' Motion for Summary Judgment must be **denied**. An Order consistent with this Opinion shall issue this same day.