**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

ELIZABETH A. SPRY; GARY SPRY;
DEMON HARVEY; MICHAEL
MCCARTHY; MARY GAYE REYES,
      *Plaintiffs-Appellees,*

v.

TOMMY THOMPSON, Secretary of
Health & Human Services; MARK
B. MCCLELLAN, Administrator,
Centers for Medicare and
Medicaid Services,
      *Defendants-Appellants,*

and

GARY WEEKS, Director, Oregon
Department of Human Services,
      *Defendant.*

No. 04-35746

D.C. No.
CV-03-00121-KI

ELIZABETH A. SPRY; GARY SPRY;
DEMON HARVEY; MICHAEL
MCCARTHY; MARY GAYE REYES,
      *Plaintiffs-Appellants,*

v.

TOMMY THOMPSON, Secretary of
Health & Human Services;
THOMAS A. SCULLY, Administrator;
JEAN THORNE, GARY WEEKS,
Director, Oregon Department of
Human Services,
      *Defendants-Appellees.*

No. 04-35750

D.C. No.
CV-03-00121-GMK

OPINION

Appeals from the United States District Court
for the District of Oregon
Garr M. King, District Judge, Presiding

Argued and Submitted
November 17, 2005—Portland, Oregon

Filed May 21, 2007

Before: Andrew J. Kleinfeld and Susan P. Graber,
Circuit Judges, and Barry T. Moskowitz,* District Judge.

Opinion by Judge Kleinfeld;
Concurrence by Judge Moskowitz

_____

*The Honorable Barry T. Moskowitz, United States District Judge for
the Southern District of California, sitting by designation.

**COUNSEL**

Alisa B. Klein, U.S. Department of Justice, Washington, D.C., for appellants-cross-appellees Secretary of Health &

Human Services and Administrator, Centers for Medicare and Medicaid Services.

Charles E. Fletcher, Assistant Attorney General, Salem, Oregon, for cross-appellee Director, Oregon Department of Human Services.

Jane Perkins, National Health Law Program, Chapel Hill, North Carolina, and Lorey H. Freeman (briefed), Oregon Law Center, Portland, Oregon, for appellees-cross-appellants.

Rochelle Bobroff (briefed), AARP Foundation Litigation, Washington, D.C., for amicus curiae AARP.

---

**OPINION**

KLEINFELD, Circuit Judge:

We deal with what federal Medicaid restrictions apply to a state program providing medical benefits to persons who are not eligible for Medicaid.

States do not have to participate in the federal Medicaid program, but if they do, the state plans must generally conform to federal Medicaid regulations. In return for their participation and conformity with federal requirements, participating state governments get partial reimbursement from the federal government. States also may experiment with new types of plans. If they do, the plans must generally conform to Medicaid regulations for Medicaid-eligible people, but the Secretary of Health and Human Services may waive some requirements. If a state chooses to expand coverage to needy people who are not eligible for Medicaid, and the Secretary exercises his discretion to approve the plan, then the needy people who are not eligible for Medicaid are neverthe-

less regarded as though they were, for purposes of calculating reimbursements to the state.[1]

This case involves a question not previously decided. Suppose the state expands its coverage in an experimental plan, called a "demonstration project," to needy people who are not eligible for Medicaid, and the Secretary waives any objection to the different provisions for those eligible for Medicaid, but does not waive or otherwise speak to the terms of coverage for needy people who are not eligible. These individuals are now *regarded as eligible* for the limited purposes of federal reimbursement to hospitals. But is the state bound by Medicaid premium and co-payment requirements (in the absence of a Secretary's waiver) even though these individuals remain statutorily *ineligible* for Medicaid under federal law? Our conclusion is that it is not.

## Facts.

The five plaintiffs in this case are not eligible for Medicaid, although their income is low. They would have to be blind or disabled, or would have to have children (they do not), to be eligible.[2] Oregon has developed a health plan to cover them despite their ineligibility. They have to pay higher premiums and higher co-payments on doctor visits, medications, etc. than they would if eligible under Medicaid. Medicaid is not totally free to recipients; they are required to pay nominal amounts as co-payments for their government provided insurance coverage, medications, doctor and hospital visits, etc. Under the Oregon plan, the premiums for these needy but Medicaid-ineligible people range from $5.00 to $20 per month, depending on income, compared to Medicaid limits of

---

[1]We have written this opinion in plain English, to facilitate our own and others' understanding of the matters discussed. For those who specialize in the field and typically use acronyms in their writing or as search terms, this is a case about OHP, OHP2, DSH, and HIFA (but not SCHIP).

[2]*See* 42 U.S.C. § 1396a(a)(10).

$1.00 to $6.00 per month. Likewise, their co-payments for medical care, prescriptions, and hospitalization are between $5.00 and $250, compared to Medicaid limits of $0.50 to $3.00.

Oregon created the predecessor to this plan in 1992, covering both people that had to be covered for the state to get Medicaid reimbursements, and people not as badly off as those that had to be covered. The plan cost the state government too much money, even after the partial federal reimbursements, so it developed in 1994 the new somewhat less ample demonstration project, which is the subject of this litigation. This lawsuit tests the permissibility of the reductions in benefits for those not eligible for Medicaid compared to the previous Oregon plan.

The federal legislation providing grants to states for medical assistance programs separates people into classes: (1) the "categorically needy,"[3] generally those eligible for welfare; aged, blind, or disabled individuals who are qualified for social security disability benefits; and low-income pregnant women and children, and (2) the "medically needy,"[4] individuals who are above the poverty line but would not be if they were not assisted with medical expenses. In order to receive federal Medicare funds, the state must provide for the categorically needy population and may provide for the medically needy population.[5]

States may also create "experimental, pilot, or demonstration" projects to serve "expansion populations"—individuals who are not as badly off as the categorically needy and the medically needy.[6] If they do, the Secretary of Health and

---

[3]*See Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 651 & n.4 (2003).

[4]*See id.* at 651 & n.5.

[5]*See* 42 U.S.C. § 1396a.

[6]42 U.S.C. § 1315.

Human Services may waive compliance with some of the federal Medicaid requirements[7] for the expansion populations and entitle the states to put the expenses for them into the formula for federal reimbursements.[8] A demonstration project may cover people who would not be eligible for Medicaid without a waiver from the Secretary. The agencies call these people "expansion populations" because the state demonstration project has expanded its coverage to include them and they are counted for federal reimbursements only because of the Secretary's waiver. These "expansion populations" are covered in addition to the categorically needy and the medically needy.

The Oregon application for waiver described the people in this lawsuit as "not otherwise eligible for Medicaid (including parents, singles and couples) with incomes up to 185 percent FPL [federal poverty line]." What is critical is that they are not eligible for Medicaid, either as a "mandatory" population (the "categorically needy") or as an "optional" population (the "medically needy"). They are childless, non-disabled adults. Oregon's plan expands public medical benefits beyond those eligible for Medicaid, even though the state could, if it chose, leave them with no benefits whatsoever under its Medicaid program.

The Secretary approved the Oregon demonstration project and gave the state its requested waiver for the "optional," "medically needy" population. For the "expansion population," though (those people not eligible for Medicaid), the Secretary took the position that no waiver was needed and neither gave nor denied a waiver for the expansion population. If the law requires compliance with Medicaid standards for people in the expansion population in the absence of a waiver, then the plan fails, because their monthly medical

---

[7]For example, the Secretary may waive insurance premium and co-payment limits. 42 U.S.C. § 1396o.

[8]42 U.S.C. § 1315(a).

insurance premiums of $6 to $20 (depending on income) and co-payments of $2 to $250 would be too high.

The plaintiffs sought class certification and injunctive and other relief under 42 U.S.C. § 1983 to prevent Oregon from requiring them to pay the premiums and co-payments. They sought summary judgment. The federal and state governments moved for summary judgment on the theory that no waiver was necessary for the expansion population. The state argued as well for dismissal on the ground that the federal statute does not create a private right of action.

The district court denied class certification, but granted summary judgment in favor of plaintiffs on the co-payments, and enjoined collection of them. This victory for plaintiffs was based on the absence of a waiver. The court granted summary judgment in favor of defendants on the premiums, and did not preclude subsequent waiver, which would eliminate the reason for the injunction on co-payments, if the Secretary went through the procedure for granting waivers.

Both sides appeal the final judgment.

## Analysis.

I.   Private Cause of Action.

[1] The State of Oregon argued, relying on *Blessing v. Freestone*[9] and its progeny, that the plaintiffs did not have any federal right enforceable under 42 U.S.C. § 1983. Although the question was arguable when the briefs were filed, it was settled after argument by a panel with priority over ours.[10] *Watson v. Weeks*[11] holds that 42 U.S.C. § 1396a(a)(10) "creates a private right of action enforceable under section 1983." We

---

[9]520 U.S. 329 (1997).

[10]Ninth Circuit General Order 4.1(a).

[11]436 F.3d 1152, 1155 (9th Cir.), *cert. denied*, 127 S. Ct. 598 (2006).

do not see a sound basis for distinguishing *Watson*, and conclude that if there is a violation in this case of the statutory standards, then the plaintiffs in this case have a private right of action enforceable under section 1983.

II.  Is Waiver Necessary?

The question whether the Secretary's waiver is necessary to allowing Oregon to collect the premiums and co-payments is one of law, decided by summary judgment, so we review *de novo*.[12] The statute speaks unambiguously, so we do not reach *Chevron*[13] deference (the Secretary has taken the position that waivers are not necessary for coverage of expansion populations not eligible for Medicaid).

[2] The waiver statute[14] enables the Secretary to "waive compliance" with certain Medicaid provisions for demonstration projects, and it provides that costs that would otherwise not be included in the reimbursement formula "shall . . . be regarded as expenditures under the State plan" and costs that would otherwise not be permissible shall be regarded as permissible.[15] The key section for this appeal is 42 U.S.C. § 1396o, regarding waivers for premiums and co-payments (termed "cost sharing" by the statute).

[3] The restrictions on imposition of premiums and co-payments under § 1396o are delineated by subsections (a) and (b). Although premiums and co-payments are distinguished and treated somewhat differently under 1396o(a) and (b), both subsections apply only to the categorically needy and medically needy populations, not to expansion populations. Under

---

[12]*See Vasquez v. County of Los Angeles*, 349 F.3d 634, 639 (9th Cir. 2003); *Brower v. Evans*, 257 F.3d 1058, 1065 (9th Cir. 2001).

[13]*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

[14]42 U.S.C. § 1315.

[15]*Id.*

subsection (a), a "State plan shall provide that in the case of individuals described in subparagraph (A) or (E)(i) of section 1396a(a)(10)(A) of this title who are eligible under the plan," only nominal cost sharing may be imposed. Under 42 U.S.C. § 1396o(b), a "State plan shall provide that in the case of individuals other than those described in subparagraph (A) or (E) of section 1396a(a)(10) of this title who are eligible under the plan," income-related premium and nominal cost sharing may be imposed. The "individuals described in subparagraph (A) or (E)(i) of section 1396a(a)(10)" are mandatory populations. That means subsection (a) permits a state plan to impose nominal premiums and cost sharing on mandatory populations. Subsection (b) permits a state plan to impose income-related premiums and nominal cost sharing on non-mandatory populations who are Medicaid eligible, i.e., optional, medically needy populations.

**[4]** Subsection (f) of this provision[16] limits waivers of the premium and co-payment provisions for demonstration projects. But this limitation on waivers only applies to the mandatory populations "described" under section 1396o(a) or the optional populations addressed by 1396o(b)—not expansion populations. People in the expansion population are not made worse off by inclusion in a demonstration project less favorable to them than to the categorically and medically needy because, without the demonstration project, they would not be eligible for Medicaid at all.

**[5]** The waiver for demonstration projects under section 1315 can cover expansion populations as well as the categorically and medically needy. But that is for a different purpose, one that benefits state governments rather than (except indirectly) covered individuals. The waiver in section 1315 enables state governments to count costs "which would not otherwise be included" or "which would not otherwise be permissible use" to be "regarded as" state plan expenditures and

---

[16]42 U.S.C. § 1396o(f)

permissible use of funds for purposes of federal reimbursement. As we held in *Beno v. Shalala*,[17] section 1315 "obligates the Secretary to evaluate the merits of a proposed state project, including its scope and its potential impact on AFDC recipients."[18] This policy evaluation is not the same thing as the precise limits under section 1396.

The plaintiffs argue that our decision in *Portland Adventist Medical Center v. Thompson*[19] requires a contrary analysis, that if a state covers an expansion population, then the premium and co-payment limits apply to the expansion population. The core of the argument is that the people in an expansion population are deemed "eligible" for Medicaid. That is not what *Portland Adventist* held.

**[6]** In *Portland Adventist*, hospitals providing services to low-income populations sued to have their services to expansion populations counted in federal reimbursement formulas. We held that, under section 1315, expenditures on services provided in an approved demonstration project should "be regarded as expenditures under the state plan."[20] But section 1315 only discusses which "expenditures," not which individuals for whom the money is expended, are to be "regarded as" being under the state Medicaid plan. Section 1396, on the other hand, affects limitations on Medicaid-eligible patients' premiums and co-payments. Expenditures being "regarded as eligible" for Medicaid for purposes of calculating hospital reimbursement is not the same thing as an individual being "eligible" for Medicaid benefits. Thus, *Portland Adventist* does not affect our determination that the term "eligible" in section 1396o means eligible for Medicaid, not merely eligi-

---

[17]30 F.3d 1057 (9th Cir. 1994).

[18]*Id.* at 1068.

[19]*Portland Adventist Med. Ctr. v. Thompson*, 399 F.3d 1091, 1096 (9th Cir. 2005).

[20]*Id.*

ble to receive benefits under a state plan, or "regarded as" eligible for Medicaid federal reimbursement.

III.   Class Certification.

Because our conclusion on the merits obviates the plaintiffs' challenge of the district court's exercise of discretion regarding class certification, we need not reach it.

## Conclusion

**[7]** The Secretary is correct as a matter of law that no waiver is necessary for expansion populations not eligible for Medicaid, to enable the state to exceed the co-payment and premium limitations applicable to these individuals. This flexibility for the state facilitates the goal of demonstration projects, developing new and better ways to provide medical assistance to the needy, including those who are not eligible for Medicaid.

**AFFIRMED IN PART AND REVERSED IN PART.** Each party to bear its own costs on appeal.

---

MOSKOWITZ, District Judge, concurring:

While I concur in the result reached by the majority, I write separately because I do not agree that the statute in question speaks unambiguously on the issue of the requirements for expansion population coverage under a demonstration project. In particular, I am unable to find the clear statutory mandate for limiting the applicability of Section 1396o(f) to only mandatory and optional, but not expansion, populations within a demonstration project.

However, we are not left to search blindly for the meaning of the relevant statutes. Rather, the Secretary has already

interpreted the statutory strictures relevant to demonstration projects and determined that a Section 1315 waiver of Medicaid program regulations is not needed for, nor does it have any applicability to, expansion populations. This is because Medicaid regulations do not apply to individuals who are not eligible for Medicaid, such as the expansion populations covered under Oregon's demonstration project. The Secretary's approval of the Oregon project was given in accordance with this determination.

I find that the Secretary's view is "based on a permissible construction of the [relevant] statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). Accordingly, I would defer to the reasonable interpretation of the Secretary, who is entrusted to administer the demonstration project authority specified in 42 U.S.C. § 1315. *See id.* at 844-45 ("[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer . . . .").

This deference is all the more appropriate in light of the difficulty attendant to parsing the dense and technical language employed in the Medicaid provisions at issue and determining the appropriate scope of Medicaid plan strictures when coverage is expanded to otherwise ineligible populations. As the Supreme Court has recognized, deference to administrative interpretations is appropriate " 'whenever [a] decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations.' " *Id.* at 844 (quoting *United States v. Shimer*, 367 U.S. 374, 382 (1960)).