**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EARTH ISLAND INSTITUTE, a
California non-profit corporation;
THE HUMANE SOCIETY OF THE
UNITED STATES; THE AMERICAN
SOCIETY FOR THE PREVENTION OF
CRUELTY TO ANIMALS, a New York
non-profit corporation;
DEFENDERS OF WILDLIFE, a District
of Columbia nonprofit corporation;
ANIMAL FUND, a California
nonprofit corporation; THE
OCEANIC SOCIETY, a California
nonprofit corporation;
INTERNATIONAL WILDLIFE COALITION,
a Massachusetts nonprofit
corporation; ANIMAL WELFARE
INSTITUTE, a Delaware nonprofit
corporation; THE SOCIETY FOR
ANIMAL PROTECTIVE LEGISLATION, a
District of Columbia nonprofit
corporation; SAMUEL F. LABUDDE,
an individual,
          *Plaintiffs-Appellees,*

v.

No. 04-17018

D.C. No.
CV-03-00007-THE

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

8363

WILLIAM T. HOGARTH, Assistant
Administrator for the National
Marine Fisheries Service; CARLOS
M. GUTIERREZ, Secretary of
Commerce,
　　　　　*Defendants-Appellants,*

　　　　　　and

CAMARA NACIONAL DE LAS
INDUSTRIAS PESQUERA Y ACUICOLA
(CANAINPESCA); ASOCIACION
VENEZOLANA DE ARMADORES
ATUNEROS (AVATUN),
　　　　　*Defendants-Intervenors.*

Appeal from the United States District Court
for the Northern District of California
Thelton E. Henderson, District Judge, Presiding

Argued and Submitted
November 16, 2006—San Francisco, California

Filed April 27, 2007
Amended July 13, 2007

Before: Mary M. Schroeder, Chief Circuit Judge,
Jerome Farris and Johnnie B. Rawlinson, Circuit Judges.

Opinion by Chief Judge Schroeder

## COUNSEL

Ryan D. Nelson, U.S. Department of Justice, Washington, D.C., for the defendants-appellants.

Richard Mooney, Home Roberts & Owen, LP, San Francisco, California, for the plaintiffs-appellees.

Laura Klaus, Greenberg Traurig, LLP, Washington, D.C., for the amici curiae.

---

## ORDER

The opinion in *Earth Island v. Hogarth*, 484 F.3d 1123 (9th Cir. 2007), is amended as follows: The last sentence of the penultimate paragraph of the slip opinion on page 4631 is deleted. The following sentence is substituted in its place: "The label of "dolphin safe" will continue to signify that the tuna was harvested in compliance with the requirements of 16 U.S.C. § 1385."

Future petitions for rehearing and petitions for rehearing en banc will not be entertained.

---

## OPINION

SCHROEDER, Chief Circuit Judge:

This case concerns the practice of catching yellowfin tuna by encircling dolphins with purse-seine nets. The dispute over whether tuna sellers may label tuna as dolphin-safe if caught with such nets has a long history that for us begins with Congress's enactment of the International Dolphin Conservation Program Act ("IDCPA") in 1997. 16 U.S.C. § 1385 (1997). The statute required the Secretary of Commerce through the National Oceanic and Atmospheric Administration ("NOAA"), to conduct certain scientific studies and determine whether or not the tuna fishery is affecting the dolphin population. According to the bill's proponents, Congress would weaken the then-strict tuna labeling requirements, and permit broader use of "dolphin-safe" labeling, only if the Secretary found that the fishery was not having a significant adverse impact on already depleted dolphin stocks.

In 1999, the Secretary made an Initial Finding, despite inconclusive evidence, that the fishery was not having an adverse impact on the dolphin population. Environmental groups then brought suit in federal district court to enjoin the Secretary's implementation of weaker labeling standards. The district court held the agency's finding of no adverse impact was arbitrary and capricious in light of the inconclusive evidence. *Brower v. Daley*, 93 F. Supp.2d 1071, 1087 (N.D. Cal. 2000) ["*Brower I*"].

On appeal to this court, we affirmed the district court's rejection of the Initial Finding, because the agency was required, but had failed, to reach a definitive answer to the questions posed by Congress. *See* 16 U.S.C. § 1414a(a). We held the agency should not have made what amounted to a default finding of no adverse impact in the absence of conclusive scientific data. *Brower v. Evans*, 257 F.3d 1058, 1071 (9th Cir. 2001) ["*Brower II*"].

The agency then did some additional studies and reached the same conclusion in a Final Finding in December 2002. The case is before us again to review District Court Judge Henderson's decision in round two that the Secretary's Final Finding is again arbitrary and capricious, because the agency still has not complied with Congressional mandates for scientific studies. *Earth Island Inst. v. Evans*, No. 03-0007, 2004 WL 1774221, at *30-31 (N.D. Cal. Aug. 9, 2004). We affirm Judge Henderson's well-reasoned decision.

## I. Background

Because the history of this dispute is so important, we outline it in some detail. For greater detail, see our prior opinion in *Brower II*, 257 F.3d at 1060-64.

In the Eastern Tropical Pacific Ocean (the "ETP"), off the west coast of South America, schools of yellowfin tuna tend to congregate underneath pods of dolphin. In the late 1950s,

fishermen started throwing large nets, called purse-seine nets, around the dolphin pods to capture the tuna below. This method of fishing is known as "setting" because the fishermen use explosives, chase boats, and helicopters to drive the dolphins into the center of large nets, which then close like a purse around all that is trapped inside. It is not disputed that the technique has caused the death of more than six million dolphins. By 1993, the extensive use of fishing with purse-seine nets depleted the stock of three species of dolphins — the northeastern offshore spotted dolphin, the eastern spinner dolphin, and the coastal spotted dolphin — to levels below their optimum sustainable population, which is the number of animals which will result in the maximum productivity of the population or the species. Today, these species of dolphin are struggling to recover. Experts estimate that their populations in the ETP are "growing" at a slow rate of anywhere between -2% and 2% annually.

Congress has long been concerned with the high mortality rate of ETP dolphins. In 1972, it enacted the Marine Mammal Protection Act ("MMPA"), which was designed to "protect marine mammals from the adverse effects of human activities." *See* 16 U.S.C. § 1371 *et seq*.; H.R. Rep. No. 105-74(I) at 12 (1997). The Act was subsequently amended to ban the importation of tuna that failed to meet certain conditions regarding dolphin mortality. 16 U.S.C. §§ 1371(a)(2)(B), 1411 *et seq*. In 1990, Congress passed the Dolphin Protection Consumer Information Act, which barred tuna sellers from labeling their products as "dolphin-safe" if the tuna was caught by intentionally encircling dolphins with purse-seine nets. 16 U.S.C. § 1385.

Given the choice of whether to purchase dolphin-safe tuna or to purchase tuna not labeled dolphin-safe, American consumers overwhelmingly chose to purchase tuna that was labeled dolphin-safe. As a result, foreign tuna sellers who did not adjust their fishing methods were quickly forced out of the market. These sellers, who were primarily from Mexico and

South American countries, consequently began lobbying for more flexible labeling requirements. In 1992, the United States joined various Latin and South American countries to form the International Dolphin Conservation Program. The program was formalized into a legally-binding agreement known as the Panama Declaration, pursuant to which the United States' delegation agreed to seek a weakening of the dolphin-safe labeling standard and allow such a label to be affixed to tuna caught with purse-seine nets as long as no dolphins were observed to be killed or seriously injured during the set. *See* S. 39, 105th Cong. (1997); 143 Cong. Rec. 379-401 (1997).

When the delegation asked Congress to change the standard, however, Congress refused to relax its strict requirements without affirmative evidence that the tuna fishery was not significantly contributing to the slowness of the recovery rate of already depleted dolphin stocks. *See e.g.*, 143 Cong. Rec. S.8299-8311 (daily ed. July 30, 1997) (statements of Sens. Snowe and Stevens). To resolve this uncertainty, it amended the MMPA and enacted the IDCPA. Together, the legislation directed the Secretary of Commerce to determine whether the "intentional deployment on or encirclement of dolphins with purse seine nets" is "having a significant adverse impact on any depleted dolphin stock in the [ETP]." 16 U.S.C. § 1385(g); *see also* 16 U.S.C. § 1414a. IDCPA directed the Secretary to make an Initial Finding by March 31, 1999 and a Final Finding by December 31, 2002. 16 U.S.C. § 1385(g)(1),(2). The amended MMPA enumerated three studies the NOAA had to conduct in making its determination:

> (A)   a review of relevant stress-related research and a 3-year series of necropsy samples from dolphins obtained by commercial vessels;

> (B)   a 1-year review of relevant historical demographic and biological data related to dolphins and dolphin stocks referred to in paragraph (1); and

(C)   an experiment involving the repeated chasing and capturing of dolphins by means of intentional encirclement [the CHESS study].

16 U.S.C. § 1414a(a)(3).

On April 29, 1999, the Secretary of Commerce made his Initial Finding, concluding that there was "insufficient evidence . . . that intentional deployment on or encirclement of dolphins with purse seine nets is having a significant adverse impact on any depleted dolphin stock in the ETP." Notice on Taking of Marine Mammals Incidental to Commercial Fishing, 64 Fed. Reg. 24590 (May 7, 1999). Environmental groups challenged the Initial Finding under the Administrative Procedure Act, 5 U.S.C. § 706(2). District Judge Henderson granted Plaintiffs' motion for summary judgment and vacated the Initial Finding. *See  Brower I*, 93 F. Supp.2d at 1089.

The government appealed, and this court unanimously affirmed. *Brower II*, 257 F.3d at 1060, 1071. We held the Secretary could not rest on a lack of sufficient evidence, because Congress specifically had ordered the Secretary to "make a finding *whether or not* the fishery-related activities were adversely impacting the dolphins [,which] requires a 'yes' or 'no' answer. . . ." *Id.* at 1066-67 (emphasis in original). We further pointed out that the best evidence available indicated that the fishery was having a significant adverse impact on the dolphin stocks. *Id.* at 1071. Lastly, the NOAA had substantially disregarded the MMPA by failing to conduct two of the three statutorily-mandated studies. *Id.* at 1070. We admonished the Secretary to follow Congress's directive and conduct the studies enumerated in 16 U.S.C. § 1414a(a). *See id.*

After our affirmance of the district court's rejection of the Initial Finding, the agency expanded the dolphin research program and conducted several new studies. These studies included a review of the fishery's indirect effects on the dol-

phin population, as well as an examination of whether changes in the ecosystem could be contributing to the dolphins' slow recovery, but this research did not include the specific studies the statute called for. In addition to these non-mandated studies, the agency also conducted a one-year review of data as required by 16 U.S.C. § 1414a(a)(1)(3)(B). These efforts culminated in a peer-reviewed report by the NOAA, known as the Final Science Report.

On the basis of that Report, Dr. William Hogarth of the NOAA issued a Final Finding on December 31, 2002, stating that "the chase and intentional deployment on or encirclement of dolphins with purse seine nets is not having a significant adverse impact on depleted dolphin stocks in the [ETP]." Taking and Importing of Marine Mammals, 68 Fed. Reg. 2010-11 (Jan. 15, 2003).

## II. The District Court's Decision Now On Review

Plaintiff-Appellee Earth Island Institute ("Earth Island") and other environmental groups challenged the finding in district court. Earth Island is a non-profit group that was founded in 1982 to promote and work for the conservation and restoration of the global environment. The group filed for summary judgment, claiming the Final Finding was arbitrary and capricious, and thus should not be implemented.

The matter came again before Judge Henderson. After hearing arguments and carefully reviewing the prior history of the dispute, Judge Henderson granted summary judgment for Earth Island on three independent grounds. *Earth Island Inst.*, 2004 WL 1774221, at *30-31.

Each ground provided a separate legal basis for the district court's conclusion that the Secretary's finding was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law. First, the district court said that because the agency did not conduct the studies required by 16

U.S.C. § 1414a(a)(3) to produce data from which scientists could draw population inferences, the Secretary "persisted in his pattern of failing to diligently pursue two out of the three mandated stress studies." *Id.* at *8. Thus, the agency's decision was arbitrary and capricious because it "entirely failed to consider an important aspect of the problem." *Id.* at *6.

Second, the agency's no adverse impact determination ran so counter to the best available evidence that its finding was implausible. *See id.* at *12-14. In so holding, the district court noted that the agency admitted there was insufficient scientific data regarding most aspects of the dolphin research program; the evidence that was available indicated the fishery was having an adverse impact on dolphins; and any insufficiency of data should be resolved in favor of the species. *Id.* at *25. This decision was rooted in the principle that Congress's intent was to change the status quo labeling requirements only if the fishery was not impacting the dolphin stocks. *Id.* at *3. Finally, the court found, what it characterized as a "compelling portrait of political meddling," *id.* at *26, which indicated the Secretary relied on factors that Congress had not intended it to consider by taking foreign policy considerations into account. *See id.* at *25-30.

Because the agency "repeatedly failed to heed both Congress'[s] intent and the teachings of the appellate court," the district court held that it would not remand the matter to the agency for further studies. *Id.* at *32. Accordingly, it vacated the Final Finding and declared that dolphin-safe labeling may not be used for tuna caught with purse-seine nets. *Id.*

In this appeal, the government challenges each of the three legal grounds on which Judge Henderson granted summary judgment for Earth Island. The government's principal contention is that the district court erred in not deferring to agency expertise in the methodology of the agency's studies. We conclude, however, that no deference to agency discretion as to methodology is appropriate when the agency ignores its

own statistical methodology. In addition, because most of the data the government relied upon was inconclusive, the district court correctly held that the Final Finding was not rationally connected to the best available scientific evidence. *See Brower II*, 257 F.3d at 1070 (holding that the agency cannot use insufficient evidence as a basis for finding no adverse impact). We also agree with the district court that the Final Finding was, to at least some degree, influenced by political, rather than scientific, concerns.

### III.   Analysis

We review a grant of summary judgment de novo, applying the same standards as the district court. *Brower II*, 257 F.3d at 1065. Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

#### A.   The Agency's failure to conduct statutorily-mandated studies.

IDCPA contained Congress's instruction that the Secretary determine the fishery's effect on ETP dolphins; the amended MMPA told the Secretary how and on what data it should base its determination. Among other studies, and relevant to this appeal, the MMPA required the Secretary to conduct:

> (A)   a review of relevant stress-related research and a 3-year series of necropsy samples from dolphins obtained by commercial vessels; . . . and

> (C)   an experiment involving the repeated chasing and capturing of dolphins by means of intentional encirclement [the CHESS study]."

16 U.S.C. §1414a(a)(3). The issue here arises because the agency, in conducting these studies, did not use sufficient sample sizes to permit extrapolation to the greater ETP dol-

phin population. We affirm Judge Henderson's decision that the agency did not satisfy the statutory requirements, because the data from the mandated studies was not sufficient to support a definitive finding as Congress directed.

[1] The necropsy study was intended to ascertain whether dolphins were dying from indirect or delayed effects of the purse-seine fishery. *See* 143 Cong. Rec. S. 8294 (July 30, 1997); 16 U.S.C. § 1414a(a)(3). For example, there was evidence that dolphins swim at top speed to avoid the netting and that they may suffer cardiac arrests and other fatal health problems some time after they are released. The Secretary understood the importance of this study in determining the extent of such indirect deaths. In 1999, he stated that more scientific research was necessary to better evaluate the effect of the purse-seine fishery on depleted dolphin stocks in the ETP and that answers to this question would come from "the completion of the necropsy sampling program." *See Brower II*, 257 F.3d at 1063.

[2] Despite the Secretary's conclusion that the completion of the necropsy study was an important factor in determining the fishery's effects on dolphins, the agency concedes that it failed to use sample sizes adequate to support population-level inferences. The NOAA determined that a minimum sample size of 300 dolphins per species was necessary to make scientifically valid conclusions regarding fishery-related effects. Consequently, according to its own data, the NOAA should have performed necropsies on a total of 600 samples: 300 northeastern offshore spotted dolphins and 300 eastern spinner dolphins. Instead, the NOAA studied a meager total of 56 dolphins, which is less than ten percent of the requisite minimum.

Despite the conceded failure to provide "meaningful and reliable scientific insights," the agency nonetheless claims that it "completed" Congress's mandate. It argues that because the language of the statute says only that the agency

must conduct necropsies, but does not state how many dolphins it must use, this court should defer to the agency's methodology in using an insufficient sample size. In essence, the agency contends that we must defer to the agency's conduct of the necropsy study and that as long as it completed any necropsy samples — even if it completed only one — it satisfied the requirements of IDCPA.

Our deference to the NOAA's chosen methodology need not extend that far. An agency's interpretation or application of a statute is a question of law reviewed de novo. *Partridge v. Reich*, 141 F.3d 920, 923 (9th Cir. 1998). Deference is due only to a "reasonable interpretation made by the administrator of an agency." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 481 (2001). Constructions that are contrary to clear Congressional intent or frustrate the policy that Congress sought to implement must be rejected. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984). An agency may not ignore factors Congress explicitly required be taken into account. *See Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d at 1443, 1448 (9th Cir. 1996).

**[3]** Congress asked the agency to answer whether the fishery is having an adverse impact on the dolphin population. The agency's posited interpretation — that the statute does not require scientific studies from which population data inferences may be drawn — is not a reasonable interpretation and flouts Congressional purpose. When the U.S. delegation signed the Panama Declaration, it promised South American countries that it would ask Congress to weaken the dolphin-safe labeling requirements. Congress refused to accept the delegation's recommendation to weaken labeling requirements without affirmative scientific evidence that the purse-seine fishery was not significantly impacting the dolphin population. *See* 143 Cong. Rec. S. 8294 (July 30, 1997). There is no basis for the Secretary's position that Congress required a scientific study upon which an important environmental deter-

mination would turn, but did not demand reliable results from that study.

Indeed, we have already underscored the importance of completing the mandated research in *Brower II*. We warned the Secretary that failing to conduct the required research and yet allowing a weaker labeling standard would "put [ ] the cart before the horse." *Brower II*, 257 F.3d at 1070. "The agency was required by law to conduct stress research as a *prerequisite* to its decision making." *Id.* (emphasis in original).

**[4]** The agency also failed to complete the statutorily-required CHESS study. The agency was supposed to capture dolphins, tag and release them, and then endeavor to recapture the dolphins in order to assess whether the fishery was impacting their health, reproduction, and survival. This study's shortcomings mirror those of the necropsy study. The NOAA admits that the number of dolphins it used in the study was too small to draw population inferences. This failure again defies the statutory mandate that the Secretary assess the impact of the fishery on dolphin populations. *See* 16 U.S.C. § 1414a(a)(1),(3). Congress did not provide for ad hoc research on a limited number of individual dolphins. *Id.*

**[5]** Congress asked for a scientifically-sound determination of the fishery's impact on dolphins. The agency's data from the necropsy and CHESS studies cannot be extrapolated to the larger dolphin population. Therefore, Congress still does not have the answer to the fundamental question outlined in IDCPA almost a decade ago, as to whether the fishery produces stress effects on the dolphins that prevent population recovery. Congress still does not have scientifically meaningful results from the studies it called for.

### B.  The best available scientific evidence does not support the Final Finding.

Independent of its holding that the agency failed to support its findings with statutorily-mandated data, the district court

also held that the finding of no significant impact was contrary to the overwhelming evidence. Although in recognition of its technical expertise and experience, we often defer to the analysis of an agency, especially within its area of competence, we need not do so when the agency's decision is without substantial basis in fact. *Fed. Power Comm'n v. Florida Power & Light Co.*, 404 U.S. 453, 463 (1972). An agency action is not supportable if it did not consider all the relevant factors and if there is no rational connection between the facts found and the determination made. *Pac. Coast Fed'n of Fishermen's Ass'ns. v. Nat'l Marine Fisheries Res.*, 265 F.3d 1028, 1034 (9th Cir. 2001). Because there is no rational connection between the Secretary's Final Finding and the evidence outlined in the Final Science Report, we do not defer to the agency in this case. *See id.*

After we told the agency in *Brower II* to consider the results of the Congressionally-mandated studies, the NOAA did not complete the studies. Rather the NOAA implemented what it called an Organized Decision Process ("the ODP") through which it appointed two expert panels to address whether ecosystem changes account for the slow growth rate and whether the direct or indirect effects of the fishery on dolphins exceed appropriate mortality standards or rise to a level that would risk or appreciably delay dolphin stock recovery. Taking and Importing of Marine Mammals, 67 Fed. Reg. at 54633, 54641-42 (Aug. 23, 2002). The agency used the results from these studies to make its Final Science Report, in which it concluded that "[the dolphins'] population growth rates are very low" and are "not consistent with recovery from depletion for either stock [of dolphins]." NOAA, REPORT OF THE SCIENTIFIC RESEARCH PROGRAM UNDER THE INTERNATIONAL DOLPHIN CONSERVATION PROGRAM ACT 8, 27 (Sept. 17, 2002) ["NOAA FINAL REPORT"]. The Final Science Report found three possible explanations for the lack of recovery: (1) the environment has changed naturally, diminishing its carrying capacity for dolphins; (2) there is a lag time before recovery begins; or (3) the purse-seine fishery is causing the slow

growth rate. *Id.* at 11. The Report conceded that the lag time rationale was not viable, and accordingly, the agency focused its inquiry on whether the environment's carrying capacity or the fishery was causing the slow recovery.

The Final Science Report conceded that due to conflicting evidence and expert opinions, it was impossible to determine whether the ecosystem was responsible for the dolphins' slow recovery, but found it doubtful. The report concluded that it "appears unlikely that carrying capacity of the ETP has declined by three- to- five-fold," which would be the amount of decline needed to account for the slow growth rate. *Id.* at 6.

The agency also looked to the direct and indirect causes of dolphin deaths and found that the fishery is not directly killing enough dolphins to account for the slow recovery, but that the indirect effects of the fishery are inconclusive. The Final Science Report outlined a number of possible indirect ways the fishery causes dolphin deaths, including: dolphin mother-calf separation during the highspeed chase and encirclement; acute cardiac and muscle damage caused by the exertion of avoiding or detangling from the nets (i.e. capture myopathy); cumulative organ damage in released dolphins due to overheating from the chase; failed or impaired reproduction; compromised immune function; and unreported mortalities due to undercounting by purse-seine fishing vessels. The report found that while these indirect effects may explain the slow recovery, conclusive data on many of these indirect effects is not available. Noting this dearth of information, the report concluded:

> Is the sum of all of these fishery effects sufficient to account for the lack of recovery? Unfortunately, the answer to this central question is not clear. For some effects, such as cow-calf separation, we have estimates of the minimum size of the effect. For others, such as stress effects and unreported mortality, we

have indications that effects may exist but do not have any quantitative estimates of their size. It is probable that all of these effects are operating to some degree, and it is plausible that in sum they could account for the observed lack of growth of the dolphin populations. If the sum of the fishery effects were a few dolphins per set or a few dolphins per 1000 chased, it would be sufficient to account for the lack of recovery. However, without comprehensive quantitative estimates for any of these effects, it is not possible to reach more definitive conclusions.

*Id.* at 33. The report thus acknowledged it did not have data to make reliable quantitative estimates of the indirect effects of the fishery on the dolphins, but the Secretary nonetheless concluded that the data support a finding of no adverse impact.

In this appeal, the government contends the data support the Final Finding, arguing the Secretary's determination is rationally connected to the evidence in the following three ways:

(1) the evidence on the direct mortality of dolphins combined with the minimum estimates of indirect deaths due to cow-calf separation in the encirclement phase is only one-third of potential biological removal limits; (2) there is uncertainty as to the extent of other indirect effects; and (3) there is insufficient evidence that these other non-quantifiable indirect effects are of a significant magnitude to risk or appreciably delay recovery of the depleted stocks.

Defendant's Brief at 40.

The data does not furnish a rationale for, or evidence to support, the Secretary's finding. The Secretary concedes that the sole piece of data helpful to his conclusion is that direct

dolphin kills constitute only one-third of the species' potential biological removal ("PBR") level. (The PBR is the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while still allowing that stock to reach or maintain its optimum population size. *See* Taking and Importing of Marine Mammals, 68 Fed. Reg. 2010, 2015 (Jan. 15, 2003)). The government, however, then asks us to leap over the indirect effects its report documents and to conclude that the fishery is not to blame for the slow growth rate.

The Report made clear that when the indirect effects of the fishery are taken into account, the direct effect on the PBR may be at a level that endangers dolphin survival. It also acknowledged that better data would have been available and helpful to this assessment if the agency used sufficient sample sizes in conducting its studies. As Dr. Hogarth of the NOAA said in the Federal Register:

> The ODP [ ] allows flexibility in determining what the threshold should be, specifically because the results of analyses on indirect mortality as well as ecosystem changes might have called for *a threshold lower than PBR*. For example, *if there had been sufficient sample sizes to make population-level inferences of the impact of indirect effects, and/or if there had been strong evidence of a dramatic reduction in carrying capacity due to ecosystem changes, then a level of mortality close to PBR might have been considered too high.*

*Id.* (emphasis added). Accordingly, the fact that direct dolphin kills constitute only one-third of the PBR — while marginally supportive of the Secretary's determination — cannot alone provide the rational connection between the Final Finding and the evidence.

The Secretary then points to the inconclusive nature of all the agency's studies and claims that the absence of evidence

allows him to make a change in dolphin-safe labeling requirements. This court already rejected such reasoning in *Brower II*, 257 F.3d at 1070, when it held that there is no basis on which to change the status quo if all of the evidence is inconclusive.

**[6]** Apart from the direct mortality inquiry, no other study the agency conducted produced any data to support the Secretary's finding. The direct mortality study alone does not provide a rational connection between the best available scientific evidence and the Secretary's finding. We therefore affirm Judge Henderson's decision on the independent ground that the Secretary's finding is not supported by the record.

### C. The Final Finding was improperly influenced by political concerns.

The district court finally concluded that the Secretary's Final Finding was arbitrary and capricious, because it was based in part on international political concerns. We have seen this issue before when the government asked us to support its Initial Finding in *Brower II*. In that appeal, the Secretary "stress[ed] that this case involves international concerns and competing policies for protecting dolphins." *Brower II*, 257 F.3d at 1065-66. We held, however, that weighing such political concerns was "within Congress's bailiwick," and that Congress's clear intent was to have the findings be based on science alone. *Id.* at 1066. Thus, if the agency's decision was in any material way influenced by political concerns it should not be upheld.

Despite our admonition, the record shows that the NOAA still took international policy concerns into account. The district court noted:

> [T]his Court has never, in its 24 years, reviewed a record of agency action that contained such a compelling portrait of political meddling. This portrait is

chronicled in documents which show that both Mex-
ico and the United States Department of State . . .
engaged in a persistent effort to influence both the
process and the ultimate finding, and that high
ranking-officials [sic] in the Department of Com-
merce were willing to heed these influences notwith-
standing the scientific evidence to the contrary.

*Earth Island Inst.*, 2004 WL 177422, at *26.

[7] We agree with the district court's conclusion that this
record demonstrates the Secretary was improperly influenced
by political concerns. In September 2001, the Secretary circu-
lated an internal memorandum and briefing packet, which
stated that "[t]he final finding is very important to the Gov-
ernment of Mexico, as the Mexican tuna industry is eager to
receive the dolphin-safe label for much of their tuna that is
imported into the United States. . . . A finding of 'no signifi-
cant adverse impact' would allow this to happen." *Id.* In
response to this memo, the Secretary afforded the Mexican
and South American governments numerous opportunities to
bypass the ODP procedures for submitting comments for
agency review and instead plead their case directly to the
highest levels. *Id.*

As the date for the issuance of the Final Finding grew near,
political pressures intensified and the NOAA responded to
them. On December 2, 2002, Under-Secretary of Commerce
Grant Aldonas told the Mexican Secretary of the Economy
that "he would look into seeking a change of venue in the
event that the Final Finding was challenged." *Id.* at *28. On
December 3, 2002, Secretary of State Colin Powell wrote
Secretary of Commerce Evans re-emphasizing the foreign
policy implications of the Secretary's decision and going so
far as to argue that the evidence was not sufficient to find a
significant adverse impact. *Id.*

The effect of these political pressures is evident in the
change of content in the NOAA's internal memoranda that

were distributed just before the Final Finding. On December 11, 2002, the NOAA staff prepared a set of talking points for the Secretary. The document stated: "Although there is uncertainty, most of the data we have point to the fishery as the cause [of the dolphins' failure to recover]," and "[a] determination of 'no significant adverse impact' is not supported by the science." *Id.* However, by December 16, 2002, the Secretary had a revised set of talking points, which emphasized larger foreign policy considerations. The new memo stated that the agency's basic goals are "dolphin recovery, continued international cooperation, getting better compliance with the [IDCP] Agreement, and maintaining a sustainable fishery." *Id.* at *28-29. It further stated, "We think we can package either decision to demonstrate that we are conservation minded, pro-active, and are dedicated to recovering dolphins as well as cooperating with our international partners." *Id.* at *29.

[8] This evidence shows that the agency's decision-making process, which was devised to conduct a scientific analysis of the fishery's effect on dolphins, was influenced to at least some degree by foreign policy considerations rather than science alone, in contravention of the Congressional mandate and our opinion in *Brower II*.

## IV.   *Where We Go From Here*

The government next contends that if it did not comply with MMPA and IDCPA, this court should direct the district court to remand to the agency for further studies. We have already done this once, to no avail, in *Brower II*. Having again failed to complete the studies, the government's brief gives no indication that the agency wants another chance to do what Congress asked it to do. There is also no evidence that the data Congress demanded would support a finding of no adverse impact. Instead, the data gathered pursuant to the MMPA indicate that there is a strong likelihood that the fishery is having an adverse impact; the non-mandated studies

NOAA conducted do not indicate any adequate alternative explanation for the lack of dolphin population recovery.

The district court therefore concluded the agency could not have properly found that purse-seine fishery was not adversely impacting ETP dolphins. The district court's order further directed the government to police enforcement of strict dolphin-safe labeling requirements.

[9] The final issue before us on appeal is properly characterized as whether we should remand for more studies or vacate the Final Finding. Although the ordinary remedy when a court finds an agency's action to be arbitrary and capricious is to remand for further administrative proceedings, a court can order equitable relief or remand with specific instructions in "rare circumstances." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). We agree with the district court that the government's intransigence in following Congress's mandate renders this case one of the rare circumstances where generic remand is not appropriate. Congress passed IDCPA in 1997 and its directive was clear to conduct these studies. The reason was because Congress would change the current labeling requirements only if the studies proved that the fishery was not having a significant adverse impact on the dolphins. The agency did not conduct two of the three studies in a way that could produce meaningful scientific results. There was, thus, no basis for the agency, without the data Congress demanded, to make a definitive finding of no adverse impact that would trigger a change in tuna labeling requirements. Furthermore, IDCPA's deadline to conduct the studies has passed.

Congress intended that there be no Final Finding about impact on the basis of a record like the one before us and without studies conducted pursuant to the Congressionally-prescribed methodology. We believe the proper course now is to implement that intent. We, therefore, vacate the Secretary's Final Finding of no adverse impact. Without such a finding,

the agency is without Congressional authority to change the qualifications for labeling tuna as dolphin-safe.

The district court went one step further, however, and ordered that the Secretary of Commerce and the NOAA not allow tuna products sold in the United States to be labeled as dolphin-safe if the tuna were caught with purse-seine nets. It also required any agent or employee of the agency who knew of impermissible labeling to notify the appropriate enforcement agencies. *Earth Island Inst.*, 2004 WL 1774221, at *32.

[10] We do not believe it is appropriate or necessary for us at this time to direct the NOAA and its agents to take enforcement measures. That would go beyond the scope of our review of the Final Finding. We, therefore, instruct the district court to limit its mandate to one that directs the Secretary to vacate the agency's Final Finding of no significant adverse impact. This means as a practical matter that pursuant to the current statute, there will be no change in tuna labeling standards absent new Congressional directive. The label of "dolphin safe" will continue to signify that the tuna was harvested in compliance with the requirements of 16 U.S.C. § 1385.

The judgment of the district court is AFFIRMED as modified.